## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **LUIS ALFREDO SANTIAGO-SEPÚLVEDA**, *et al.*, | |
| Plaintiffs, | |
| v. | Civil No. 08-1950 (BJM) |
| **ESSO STANDARD OIL COMPANY (PUERTO RICO), INC.**, *et al.*, | (Lead Case) |
| Defendants | |
| **ROBERTO MUÑOZ ARILL**, *et al.*, | |
| Plaintiffs, | |
| v. | Civil No. 08-2032 (BJM) |
| **ESSO STANDARD OIL COMPANY OF PUERTO RICO, INC.**, *et al.*, | |
| Defendants | |
| **CARLOS GONZÁLEZ-RAHOLA**, *et al.*, | |
| Plaintiffs, | |
| v. | Civil No. 08-2044 (BJM) |
| **ESSO STANDARD OIL CO. (PUERTO RICO)**, *et al.*, | |
| Defendants. | |

## OPINION AND ORDER

On September 11, 2008, Roberto Muñoz Arill ("Muñoz Arill"), Laura Rebeca Ayoroa ("Ayoroa"), their conjugal partnership, Julio Muñoz Delgado ("Muñoz Delgado"), Frayda Maiz Rivera ("Maiz Rivera"), and others  (collectively, "the Muñoz plaintiffs") sued Esso Standard Oil Company of Puerto Rico, Inc. ("Esso") and Total Petroleum Puerto Rico Corporation ("Total") under Title I of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §§ 2801–2807 over

Esso's decision to terminate their gas station franchises and leave the Puerto Rico market.[1]   (Civil No. 08-2032, Docket No. 1).   On September 15, 2008, Carlos González Rahola ("González Rahola"), Lourdes Llamas ("Llamas"), and their conjugal partnership (collectively, "the González plaintiffs") also sued Esso under the PMPA, and sought a refund of money paid to Esso under a 1990 contract.   (Civil No. 08-2044, Docket No. 1).   These cases were consolidated with Civil Nos. 08-1950, 08-1986, and 08-2025 (collectively, "the Santiago cases") on September 24, 2008.   (Docket No. 46).   The court held a hearing on injunctive relief in the Santiago cases from September 30, 2008 through October 2, 2008.   (Docket Nos. 82, 83, 84).   On October 7, 2008, the Muñoz and González plaintiffs agreed to forego a preliminary injunction and permit Total to take Esso's place in their franchise agreements, while preserving their claims in all other respects.   (Docket No. 81).

Before the court are motions for summary judgment by Esso (Docket No. 299) and Total (Docket No. 358), which were held in abeyance pending the outcome of an appeal in the Santiago cases.   (Docket No. 363).   Both groups of plaintiffs opposed Esso's motion (Docket Nos. 319 and 331), Esso replied (Docket No. 334), and the Muñoz plaintiffs sur-replied (Docket No. 347).   The González plaintiffs also moved for summary judgment on their refund claim against Esso.   (Docket No. 331, p. 5–7).   Both groups opposed Total's motion[2] (Docket Nos. 385 and 401) and Total replied (Docket No. 418).   For the reasons that follow, defendants' motions for summary judgment are **granted**, and the González plaintiffs' motion is **denied**.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts of the case are summarized here after applying Local Rule 56, which structures the

---

[1] Of the other plaintiffs in this complaint, Herbert Morales Mercado, Ivonne Blassini Santos, and their conjugal partnership have since voluntarily dismissed their claims.   (Docket No. 387).   The attorney for Ramon Martinez Borges, Nora Viota Garcia, their conjugal partnership, and RM Petroleum, Inc. was granted leave to withdraw from representation on February 27, 2009.   (Docket No. 232).

[2] The González plaintiffs assert that Total cannot move for summary judgment in their case because they did not plead claims against Total.   However, the court granted Total's motion to intervene in the González case on October 9, 2008.   (Docket No. 91).

presentation of proof at summary judgment.[3]

### *Plaintiffs' Relationship with Esso*

Muñoz Arill and Ayoroa stated that they were Esso franchisees for over 30 years, and had been in an agreement with Esso since January 1, 2008. (Docket No. 321, hereinafter "Muñoz St.," ¶ 1). Muñoz Delgado and Maíz Rivera stated that they were franchisees under an agreement with Esso since August 31, 2007. (Muñoz St., ¶ 2). A contract with Esso states that Muñoz Delgado agreed to the lease of a gas station, that Maiz Rivera consented to the transaction as Muñoz Delgado's wife, and that Muñoz Delgado would be considered the lessee/franchisee under the PMPA. (Docket No. 346-2, p. 2). González Rahola stated that he and Llamas were franchisees under an agreement with Esso since September 6, 2007. (Docket No. 331-4, hereinafter "González St.," ¶ 1). A contract with Esso states that González Rahola agreed to the lease of a gas station, that Llamas consented to the transaction as González Rahola's wife, and that González Rahola would be considered the lessee/franchisee under the PMPA. (Docket No. 346-3, p. 2). The plaintiffs operated convenience stores under separate agreements with Esso. (Muñoz St., ¶ 3).[4] While Esso built the store facilities, the plaintiffs operated them, bore the operational costs, developed the stores' market, and purchased the products sold in the stores for resale. (Muñoz St., ¶ 4).

### *Esso's Withdrawal from Puerto Rico*

Esso began "exploring the possibility of leaving Puerto Rico" in late 2006 because of the

---

[3] The rule "relieve[s] the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute," CMI Capital Market Inv. v. González-Toro, 520 F.3d 58, 62 (1st Cir. 2008), and prevents parties from "shift[ing] the burden of organizing the evidence presented in a given case to the district court." Mariani-Colón v. Dep't of Homeland Sec., 511 F.3d 216, 219 (1st Cir. 2007). The penalty for noncompliance is severe: "If the party opposing summary judgment fails to comply with Local Rule 56(c), the rule permits the district court to treat the moving party's statement of facts as uncontested." Id. Thus, litigants ignore the rule "at their peril." Id.

A motion for summary judgment must be supported by "a separate, short, and concise statement of material facts, set forth in numbered paragraphs, as to which the moving party contends there is no genuine issue of material fact to be tried." Local Rule 56(b). The opposing party must admit, deny, or qualify the moving party's facts by reference to each numbered paragraph, and may make a separately numbered statement of material facts. Local Rule 56(c). The moving party may reply and admit, deny, or qualify the opponent's newly-stated facts, again in a separate statement and by reference to each numbered paragraph. Local Rule 56(d). Any facts supported by citation to record evidence and not properly controverted as described by the rule are deemed admitted. Local Rule 56(e).

[4] For clarity, I cite only the Muñoz statement wherever it overlaps with the González statement.

company's financial losses.  (Docket No. 299-3, hereinafter "Esso St.," ¶ 1).[5]  Estuardo Trujillo ("Trujillo"), Esso's president, testified that Esso negotiated with Total and other potential purchasers between mid-2007 and March 2008.  (Esso St., ¶ 2).  According to the plaintiffs' statements, "[d]uring the year 2007[,] ESSO announced publicly that it had decided to withdraw from the marketing of motor fuels in Puerto Rico.  On or about April 2007, Puerto Rican newspaper clippings reported that ESSO began to sell and/or offer for sale its franchises in Puerto Rico." (Muñoz St., ¶ 5).  On March 7, 2008, Esso's Board of Directors resolved to sell its assets to Total.  (Esso St., ¶¶ 3–4).  On March 10, 2008, Esso communicated its decision to the Governor of Puerto Rico and some other agencies, and distributed a press release.  (Esso St., ¶ 6).  The company notified the Governor in person on March 10.  (Esso St., ¶ 7).  Trujillo testified that the Governor's office received a letter stating their decision to leave Puerto Rico, which Trujillo had signed.  (Esso St., ¶ 9).  Trujillo testified that Esso sent a "standard letter" to "many of these agencies and authorities," and that Esso contacted the Puerto Rico Land Administration, the Federal Trade Commission, the Puerto Rico Environmental Quality Board, the Environmental Protection Agency, and the U.S. Coast Guard.  (Esso St., ¶ 10).  Trujillo testified that Esso sent letters by certified mail to its dealers, informing them that their contracts would be terminated on September 30, and that Esso representatives hand-delivered the letters as well.  (Esso St., ¶¶ 11–12).

On March 17, 2008, Esso sent letters to Ayoroa, Muñoz Delgado, and González Rahola

---

[5] In their opposing statements of fact, both groups of plaintiffs object to Esso citing injunction hearing testimony, on grounds repeated verbatim in 20 consecutive paragraphs.  They first assert that "Esso failed to attach the identified record material to its Statement of Undisputed Facts as required by LR56(e)."  (Docket Nos. 320 and 331-4, ¶¶ 1–20).  Local Rule 56(e) requires that the statement of facts include "a citation to the specific page or paragraph of identified record material supporting the assertion," but imposes no requirement that the material be "attached" to anything in particular.  Esso's statement of facts plainly notes that its citations to hearing testimony refer to the September 30, 2008 transcript.  That transcript is docketed at ECF number 162, and is therefore part of the record.  Plaintiffs alternatively reason that because they were not parties to the hearing, the testimony "cannot be attributed to them. . . . [T]heir allegations in the (amended) complaint remain intact and not adjudicated."  (Docket Nos. 320 and 331-4, ¶¶ 1–20).  This rings hollow.  Plaintiffs' absence at the hearings does not automatically render the testimony inadmissible for summary judgment, and plaintiffs do not articulate any evidentiary objections.  Thus, to the extent not properly opposed, I have deemed Esso's properly supported facts admitted.  Nevertheless, I have disregarded the portions of Esso's statement that are solely supported by the findings stated in the October 18, 2008 opinion and order, as those findings are not evidence.

stating that Esso would stop distributing motor fuel in Puerto Rico, that it had an agreement to sell its assets to Total, that its determination was made under sections 2802(b)(2)(E) and 2804 of the PMPA, and that its agreements would terminate on September 30, 2008.  (Muñoz St., ¶ 6).  The letter was not addressed to Maíz Rivera or Llamas.  (Id.).  Esso proffered a letter dated March 17, 2008 addressed to "Mrs. Laura Rebeca Ayoroa and Mr. Roberto Muñoz."  (Docket No. 346-3).  The letters stated that Esso's procedures would not change prior to September 30, 2008, that dealers would receive further information, that a Total representative would visit to offer a new franchise contract, and that Esso would work with Total and the dealers to effect the transition.  (Muñoz St., ¶ 7).  The plaintiffs ambiguously state that "[t]his did not happen," though it is not clear what "this" means.  (See id.).  The letter did not expressly address what would happen to plaintiffs' convenience stores.  (Muñoz St., ¶ 8).

In August 2008, Esso began "partial debranding" by removing small Esso signs from certain stores, leaving Esso signs on pumps and on the canopy structure covering the pumps.  (Docket No. 359, hereinafter "Total St.," ¶ 14).  Around September 22, 2008, because of the pending requests for injunctive relief in the Santiago cases, Esso extended the time for its withdrawal until the end of October.  (Total St., ¶ 15).

***Total's Franchise Contracts***

Pierre Alexander Vigil, who was Total's marketing director between October 2004 and August 2008, testified that Esso retailers were offered "standard franchise contracts," which were also offered to some Total retailers and to all new potential Total dealers.  (Esso St., ¶ 15).  Total does not negotiate certain general terms of its franchise agreements with individual franchisees.  (Total St., ¶ 24).  The agreements state that they are governed by Puerto Rico law, and that unenforceable terms are severable.  (Total St., ¶ 25).  Several Total dealers entered these franchise contracts.  (Esso St., ¶ 16).  The standard contract was drafted in 2005, and its terms were revised in 2007 and 2008.  (Esso St., ¶¶ 17–18).  Vigil testified the changes were made in response to market conditions and Total's business experience under the contracts.  (Total St., ¶ 17).  These changes included a goodwill clause, a clause regarding personal guarantees and payment bonds, and a clause

regarding subleases.  (Id., ¶¶ 17–19).  Vigil testified that the sublease provision was offered in order to establish fast food restaurants, broaden the services offered, and increase customer flow at the stations.  (Total St., ¶ 18).  The revised contract  was offered to new and renewal franchisees.  (Esso St., ¶ 19).  Total has not signed or renewed versions of its franchise contracts predating the revisions. (Total St., ¶ 22).

In July 2008, Total offered a Lease Agreement, Sales and Supply Agreement, and Convenience Store Franchise to Ayoroa, Muñoz-Delgado, González Rahola, and Llamas.  (Muñoz St., ¶ 9).  The offered contracts were different from some already-existing Total contracts and the Esso contracts they were replacing.  (Muñoz St., ¶ 10).

### The González Plaintiffs' Private Agreement

Pursuant to a 1990 "Private Agreement," the González plaintiffs paid Esso $250,000 in two installments.  (González St., ¶¶ 11–12).  On September 6, 2007, Esso and the González plaintiffs executed a lease agreement, which provided that Esso would have no responsibilities on termination of the lease except as provided in the private agreement.  (González St., ¶ 14).  González Rahola's acts did not cause the termination of the Esso lease agreement.  (González St., ¶ 16).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material only if it "might affect the outcome of the suit under the governing law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and "[a] 'genuine' issue is one that could be resolved in favor of either party."  Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004).  The court does not weigh the facts, but instead ascertains whether the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Leary v. Dalton, 58 F.3d 748, 751 (1st Cir. 1995).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [evidence] . . . which it believes demonstrate the absence of a genuine issue of material fact."  Crawford-El v. Britton, 523

U.S. 574, 600 n.22 (1998) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1).  Once this threshold is met, the burden shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  However, the court draws inferences and evaluates facts "in the light most favorable to the nonmoving party," Leary, 58 F.3d at 751, and an evaluating court may not "superimpose [its] own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon the facts of the record." Greenburg v. P.R. Maritime Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987).

Nonetheless, summary judgment is appropriate where the nonmoving party rests entirely upon "conclusory allegations, improbable inferences, and unsupported speculation" on any essential element of the claim.  Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

## PRELIMINARY QUESTIONS

Defendants move for summary judgment on the plaintiffs' PMPA claims; additionally, Esso and the González plaintiffs make cross motions for summary judgment on the González plaintiffs' claim for refund of a $250,000 payment they made to Esso.  Before reaching substantive matters, however, I pause to resolve two questions regarding what matters are before the court: (1) whether to allow an amended complaint filed by the Muñoz plaintiffs in April 2009, and (2) whether findings and holdings in the Santiago cases control the issues here.

**I.      The Muñoz Plaintiffs' Amended Complaint**

The Muñoz plaintiffs argue that the motions for summary judgment do not reach a claim first raised in the "Verified Amended Complaint" (Docket No. 246) of April 29, 2009.  (Docket No. 319, p. 2 n. 1).  Defendants, however, argue that plaintiffs were never granted leave to file the amended complaint.  Under the Federal Rules of Civil Procedure then in effect, amendments were always permitted once before service of a responsive pleading, or within 20 days "if a responsive pleading is not allowed and the action is not yet on the trial calendar." Fed. R. Civ. P. 15(a)(1) (West 2009).  Absent written consent of the opposing party, amended pleadings were (and are) only allowed with leave of court.  R. 15(a)(2).  Though leave should be granted freely "when justice so requires," id.,

a court may deny leave for "any adequate reason," including "undue delay, bad faith or dilatory motive . . . ."  Feliciano-Hernandez v. Pereira-Castillo, 663 F.3d 527, 538 (1st Cir. 2011) (quoting ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 55 (1st Cir. 2008) and Foman v. Davis, 371 U.S. 178, 182 (1962)).

The amended complaint (1) omits the claims of certain plaintiffs, (2) alters the allegations regarding which plaintiffs received termination notices, and most importantly, (3) adds new allegations seeking return of a monthly fee charged since 1990.  (Compare Civil No. 08-2032, Docket No. 1 with Civil No. 08-1950, Docket No. 246).  The record does not show any motion for leave to file the amended complaint, or that any such leave was granted.  Without opining on whether leave would have been granted in April 2009, plaintiffs' failure to follow Rule 15 is likely the only reason that the additional allegations have gone unnoticed for so long.  Therefore, the "Verified Amended Complaint" (Docket No. 246) is **left without effect** for failure to obtain leave of court.

## II.    Force of the Court's Holdings in the Santiago Cases

Both plaintiffs and defendants misunderstand the effect of findings in the Santiago cases.  For example, Esso argues that "[t]here is nothing new here for the court to consider" in light of, among others, the October 18, 2008 opinion and order denying injunctive relief (Docket No. 118), the February 25, 2009 order granting summary judgment on certain counterclaims (Docket No. 228), and the June 23, 2009 opinion and order entering final judgment in 08-1950, 08-1986, and 08-2025.  (Docket No. 299-2, p. 6; Docket No. 334, p. 3).  Esso often suggests that the plaintiffs' arguments have already been evaluated and decided.  (See, e.g., Docket No. 334, p. 2) ("Thus, unless the Court is now going to reverse itself, summary judgment is appropriate here.").  Similarly, Total argues that "the First Circuit's holding . . . controls here as well."  (Docket No. 418, p. 13).  But neither Esso nor Total explain why this must be the case, and neither set forth nor apply any particular doctrine of preclusion or estoppel.  Indeed, Esso concedes that the earlier rulings are not "the procedural equivalent of a judgment against [the Muñoz and González] Plaintiffs."  (Docket No. 334, p. 3).

Whether or not these are "the same recycled and previously rejected arguments," the

defendants are now moving for summary judgment rather than opposing an injunction.  The court's

role here is to determine whether there are trial-worthy issues, not to weigh the evidence and make

findings.  I therefore will independently analyze the defendants' motions on the strength of the

submitted evidence and argument, evaluated under the burdens and standards in play at summary

judgment; I decline the invitation to treat the earlier decisions as mandating the same result *per se*.

Relatedly, the Muñoz plaintiffs assert that language in the Court of Appeals opinion in the

Santiago cases bars the entry of summary judgment on any extant Puerto Rico law claims:

> The franchise agreements are largely governed by Puerto Rico law and such severance is permissible under Puerto Rico law.  E.g., McCrillis v. Autoridad de las Navieras de P.R., 23 P.R. Offic. Trans. 109, 132-33, 123 D.P.R. 113 (1989) ("[T]he parties, by mutual agreement, stipulated the partial conservation of the contract. There is no protected social interest that bars this solution." (footnote omitted)).  Nor, as plaintiffs mistakenly claim, is severance equivalent to "reformation," 27 R. Lord, Williston on Contracts § 70:19 (4th ed. 2003), so the conditions for reformation are beside the point.

> Plaintiffs also say that any terms inconsistent with Puerto Rico law amount to a required waiver or release of state law rights forbidden by section 2805(f)(1) and that, as they have not been paid separately for such a waiver or release, the contract fails for want of consideration.  Congress was apparently willing to allow such waivers or releases if compensated, H.R.Rep. No. 103-737, at 6 (1994), *reprinted in* 1994 U.S.C.C.A.N. at 2782; S.Rep. No. 103-387, at 4 (1994), but the terms found invalid were voided by the magistrate judge and so could hardly justify compensation.

> As the last of their substantive claims, plaintiffs say that the magistrate judge should have invalidated, under 15 U.S.C. § 2805(f)(1), still other provisions of the contract as violations of state law—for example, a non-compete clause relating to convenience store operations.  No request for their invalidation was made until plaintiffs' reply brief and so they are barred on this appeal, Rivera-Muriente v. Agosto-Alicea, 959 F.2d 349, 354 (1st Cir.1992), but plaintiffs may pursue whatever remedies they retain under state law.

Santiago-Sepúlveda v. Esso Std. Oil Co. (P.R.) (*Santiago Appeal*), 643 F.3d 1, 8 (1st Cir. 2011);

(Docket No. 401, p. 15–16).  Plaintiffs do not explain how the quoted passage, which deals with an

untimely argument for invalidation of contract terms, pertains to any of their claims here.  The

complaint does not identify any Puerto Rico claims at all, nor does it seek any remedies under even

a passing reference to Puerto Rico law.  (See Civil No. 08-2032, Docket No. 1).  And as more fully

explained *infra*, the plaintiffs have not even developed an argument for why any particular clause

can or should be invalidated in this court.  In sum, this skeletal argument is waived.  See United

States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

With these preliminary questions resolved, I turn to defendants' motion for summary judgment of the PMPA claims.

## PETROLEUM MARKETING PRACTICES ACT

The PMPA "is a conventional dealer-protection statute limiting the circumstances in which a motor fuel franchisor can terminate or choose not to renew a franchise relationship." *Santiago Appeal*, 643 F.3d at 4. Terminating or failing to renew a franchise is only permitted for one of the PMPA's enumerated reasons, and subject to proper advance notice. C.K. Smith & Co. v. Motiva Ents. LLC, 269 F.3d 70, 74 (1st Cir. 2001). Broadly, reasons for termination or nonrenewal under the PMPA include the franchisee's material noncompliance with reasonable franchise terms; the franchisee's failure to exert good faith efforts to carry out the franchise terms; the occurrence of a relevant event making termination reasonable; a written agreement to end the franchise; or—relevant here—a franchisor's good faith withdrawal from a geographic market area. See 15 U.S.C. § 2802(b)(2). Additional grounds justify nonrenewal, but not termination. See § 2802(b)(3). A "franchise" under the PMPA is "any contract . . . under which a refiner or distributor . . . authorizes or permits a retailer or distributor to use, in connection with the sale, consignment or distribution of motor fuel, a trademark which is owned or controlled by such refiner . . . ." 15 U.S.C. § 2801(1). A "franchisee" under the PMPA is "a retailer or distributor . . . who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel." 15 U.S.C. § 2801(4). A "retailer" is "any person who purchases motor fuel for sale to the general public for ultimate consumption." § 2801(7).

In an action against a franchisor, a franchisee has the burden of proving that a franchise was terminated, or that a franchise relationship was not renewed; the franchisor, however, bears the burden of establishing compliance with the PMPA as an affirmative defense. *Santiago Appeal*, 643 F.3d at 5; 15 U.S.C. § 2805(c). Therefore, a franchisor moving for summary judgment cannot prevail on a compliance defense "unless the evidence he provides on that issue is conclusive." See Torres Vargas v. Santiago Cummings, 149 F.3d 29, 35 (1st Cir. 1998) (discussing affirmative

defenses at summary judgment).

Here, plaintiffs claim that Esso terminated their franchises without fully complying with the PMPA requirements for (1) notice of termination and (2) good faith market withdrawal. The defendants argue that Esso complied with the PMPA and that they are entitled to summary judgment. I therefore proceed through each element of the compliance defense.

## I.     Notice Requirement

Prior to terminating a franchise, a franchisor must timely "furnish notification of such termination to the franchisee . . . who is a party to such franchise," by certified mail or personal delivery, providing (1) a statement of intent to terminate the franchise, (2) the reasons for such termination, (3) the date on which the termination takes effect, and (4) a standard statement prepared by the Secretary of Energy. 15 U.S.C. §§ 2804(a), 2804(c). A franchisor withdrawing from a geographic market must provide this notice at least 180 days before the termination becomes effective, and must provide the Governor of affected states with a copy of the notification and "a plan describing the schedule and conditions under which the franchisor will withdraw." § 2804(b)(2). Plaintiffs argue that Esso cannot establish a compliance defense because it (1) only addressed notice to one spouse from each marriage, (2) did not detail its reasons for withdrawal, and (3) did not properly notify the Governor of Puerto Rico.

### A.     Notice to Spouses

Muñoz Arill, Maíz Rivera, and Llamas argue that Esso cannot establish its compliance with the PMPA because only their spouses received termination notices.[6] In response, Esso argues that Maíz Rivera and Llamas were not franchisees entitled to notice at all, and proffers evidence that it sent notification to Muñoz Arill by certified mail.

The purpose of the PMPA notice requirement is to "protect[] franchisees from arbitrary or unanticipated terminations" of their franchises. Seahorse Marine Supps., Inc. v. P.R. Sun Oil Co., 295 F.3d 68, 78 (1st Cir. 2002). Thus, "[t]he PMPA's notice provisions mandate strict compliance

---

[6] Muñoz Delgado and Maíz Rivera appear to have previously been married (as indicated in the agreements) but subsequently divorced (as indicated in their summary judgment statements).

and . . . cannot be selectively followed by the franchisor." Id. at 77.  Nevertheless, "under the proper circumstances a court could hold that actual notice may suffice . . . ." Desfosses v. Wallace Energy, Inc., 836 F.2d 22, 27 (1st Cir. 1987) (regarding notice of the franchisor's loss of an underlying lease).

Seahorse illustrates the rationale behind the PMPA notice requirement.  There, Sun Oil revoked a franchise by sending a letter that stated:

> Even though our Supply Agreement expired on September 14, 1990 and we agreed to continue supplying fuel to you under its terms through [M]arch 15, 1991, Seahorse continues to use in its operations our trademark and trade name.
>
> We are hereby requiring you to discontinue using our trademark and trade name to promote your business and we would expect that you immediately honor our request.

Seahorse, 295 F.3d at 77.  Prior to trial, the district court ruled that this letter did not comply with the PMPA notice requirements.  Id. at 76.  On appeal, Sun Oil conceded that the letter did not "expressly" inform Seahorse of its reason for termination, and was not sent by certified mail or personal delivery; however, it argued that Seahorse had "actual notice" based on earlier complaints Sun Oil had made.  Id. at 78.  The court rejected this argument because Sun Oil's "continuing relationship with Seahorse led to the permissible inference that Sun Oil did not consider any of Seahorse's transgressions grounds for determination. . . .  Even if Seahorse was delinquent, it justifiably relied on Sun Oil's inaction."  Id.

Here, Maíz Rivera and Llamas, as putative franchisees, have the initial burden of establishing that Esso improperly terminated a PMPA "franchise" or "franchise relationship."  15 U.S.C. § 2805(c).  Their only support for this contention comes from statements that they were each "an ESSO 'Franchisee' as defined by the P.M.P.A., 15 U.S.C. §2801(1)(A)&(B) . . . ."  (Docket Nos. 320-4, 320-5, and 331-2, ¶ 1).  González Rahola's statement also avers that "my wife . . . [was] obligated to be bound by all obligations under the agreements," but goes no further.  These are little more than "conclusory allegations for which the only evidentiary support is [a statement], which itself contains conclusory allegations."  See Méndez-Aponte v. Bonilla, 645 F.3d 60, 68 (1st Cir. 2011) (affirming imposition of Rule 11 sanctions).  Esso, in contrast, points to franchise agreements reciting that Maíz Rivera and Llamas signed as consenting members of their conjugal partnerships,

but not franchisees themselves.  (See Docket Nos. 336-4 and 346-2).  While franchisee status is determined by the PMPA and not magic words in a contract, Esso's evidence places the burden on Maíz Rivera and Llamas to establish a genuine issue of fact.  There is no evidence of a PMPA "franchise" with either of them individually, and they point to no competent evidence from which to draw inferences in their favor.  Therefore, Maíz Rivera and Llamas cannot avoid summary judgment on receipt-of-notice grounds.

In contrast, there is no dispute that Muñoz Arill was a franchisee entitled to be furnished with notice.  "[I]f the language of a statute or regulation has a plain and ordinary meaning, courts need look no further and should apply the regulation as it is written."  Textron, Inc. v. Comm'r, 336 F.3d 26, 31 (1st Cir. 2003).  The PMPA states that a "franchisor shall furnish notification" of termination or nonrenewal to the franchisee.  15 U.S.C. §§ 2804(a), 2804(b)(2).  "Furnish" is a transitive verb meaning "[t]o equip with what is needed, esp. to provide furniture for," or "[t]o supply; give."  American Heritage Dictionary (2d college ed. 1982).

Muñoz Arill states under penalty of perjury that "ESSO notified co-Plaintiff Rebeca Ayoroa only, by letter," of its withdrawal.  (Docket No. 320-2, ¶ 6).  Ayoroa similarly avers that "ESSO notified co-Plaintiff me [sic] only, by letter," of its withdrawal.  (Docket No. 320-3, ¶ 5).  At first glance, Muñoz Arill and Ayoroa's broad statements could be evidence that Esso did not furnish Muñoz Arill with notice of termination.  However, there is no foundation for Muñoz Arill or Ayoroa's personal knowledge of whether Esso *sent* notification; thus, the statements can only show that Muñoz Arill did not *receive* the letter himself.[7]  On the other hand, Trujillo testified that Esso sent its dealers notices by certified mail, as well as by personal delivery through its representatives.  (Esso St, ¶¶ 11–12).  Furthermore, Esso submitted a copy of a termination letter dated March 17, 2008, purportedly "by hand and certified with acknowledge [sic] receipt," with certified mail number

---

[7] Indeed, if Muñoz Arill received the notice and only complains that another copy was not addressed separately to him, then he merely "contest[s] who the proper addressee should have been," which does not refute the compliance defense absent some showing of prejudice.  See Shell Oil Co. v. Czar, Civil No. N-88-388 (EBB), 1988 WL 404539, at *2 (D. Conn. Apr. 19, 1988) (notice addressed to corporation's president sufficient to furnish notice to corporation).

"7111 7997 0930 0000 3140" and addressed to:

> Mrs. Laura Rebeca Ayoroa and
> Mr. Roberto Muñoz
> Cañaboncito Esso
> R.R.-9, Box 1798
> San Juan, PR 00926.

(Docket No. 346-4).  Taken together, these pieces of evidence establish that Esso sent notice by certified mail to Muñoz Arill.  Since Muñoz Arill's evidence does not prove whether Esso sent the notice it purports to have sent, he has not raised a fact question as to whether Esso furnished him with notice as required by § 2804.  Therefore, I proceed to the next alleged defect.

### B.      Notice of Reasons for Termination

The Muñoz plaintiffs argue that the notice letters, even if properly sent to franchisees, "merely copied the statutory language" and failed to state the reasons for termination.  (Docket No. 319, p. 12).  To satisfy § 2804(c), a franchisor must furnish a reason that is "specific enough for the franchisee to determine whether nonrenewal [or termination] rests on lawful grounds."  Svela v. Union Oil Co. of Calif., 807 F.2d 1494, 1498 (9th Cir. 1987) (citing Brach v. Amoco Oil Co., 677 F.2d 1213, 1225–26 (7th Cir. 1982)); see Moody v. Amoco Oil Co., 734 F.2d 1200, 1211 (7th Cir.), cert. denied, 469 U.S. 982 (1984) (requirement was satisfied where franchisees did not argue they were "unable to determine the reason given or that they did not understand their rights").

Here, the relevant content of the notice letters is undisputed.  In their respective statements under penalty of perjury, plaintiffs aver that Esso's notice "specifically stated that [its] decision was taken in accordance with the P.M.P.A.'s §2802(b)(2)(E) and § 2804, and was 'a determination made by the franchisor in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area . . . .'" (Docket No. 320-2, ¶ 6; Docket Nos. 320-3, 320-4, 320-5, and 331-2, ¶ 5) (language identical in each statement).  Plaintiffs characterize this as equivalent to "a notice baldly stating that the franchise had been non-renewed."  (Docket No. 347, p. 4).  However, no jury could rationally conclude that the letters did not convey a reason for terminating the franchise, or that it failed to inform the plaintiffs of the legal ground Esso was relying on.  The notice invokes a specific statutory ground, 15 U.S.C. §

2802(b)(2)(E), and Esso now invokes that ground here. There is no indication that Esso's position shifted or exploited any ambiguity in the statement. Therefore, Esso has established this element of notice.

### C.      Notice to the Governor of Puerto Rico

To invoke the market withdrawal defense, a franchisor must show that it promptly provided the Governor of each affected state with a copy of the notification furnished to franchisees, "together with a plan describing the schedule and conditions" of the withdrawal. 15 U.S.C. § 2804(b)(2)(B). Puerto Rico is deemed a state for this purpose. § 2801(19). Plaintiffs argue that Esso did not show that it presented the Governor of Puerto Rico with a withdrawal plan as required by § 2804. (Docket No. 319, p. 13). However, the April 21, 2008 letter to Governor Acevedo Vilá establishes the defense. The letter states that Trujillo met with the Governor, planned to cease its branded fuel distribution effective September 30, 2008, and planned to sell its assets and transition its operations to Total; it also refers to attached termination notices. (Docket No. 359-6). Accordingly, defendants have submitted evidence that the Governor was provided with both a plan and copies of the termination notices; moreover, plaintiffs offer no evidence to the contrary.

Because Esso and Total have submitted conclusive evidence that Esso satisfied each element of the notice requirement, they have established that they are entitled to summary judgment on notice grounds. I therefore go on to consider whether they have established a market withdrawal defense.

## II.      Market Withdrawal Defense

The market withdrawal provision of the PMPA permits termination of a franchise where the franchisor (1) determines "in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area," (2) makes the determination after the signing or renewal of the franchise at issue, and (3) bases its determination on changes in "relevant facts and circumstances after such date." § 2802(b)(2)(E). Additionally, with respect to leased marketing premises, a party purchasing the franchisor's assets must offer existing franchisees a new franchise in good faith and on terms "which are not discriminatory to the franchisee as compared to franchises then currently being offered . . . or franchises then in effect and

with respect to which [the third party] is the franchisor." 15 U.S.C. § 2802(b)(2)(E)(iii)(II). Esso

claims it was entitled to terminate plaintiffs' franchises under this defense, and plaintiffs challenge

the first and second elements, as well as the adequacy of Total's offer. I consider them in turn.

### A.   Determination Made in Good Faith

To establish the first element of the defense, Esso argues that it determined in good faith and

in the normal course of business to withdraw from business in Puerto Rico, based on Trujillo's

testimony at the preliminary injunction hearing:

> Q.     Mr. Trujillo, let me take you back a little bit. You said that you had made the
> business decision to leave the market in Puerto Rico. Can you share with the Court
> some of the thought process or some of the reasons behind that business decision to
> leave Puerto Rico?
>
> A.     Well, the first were the financial losses that the company had had for almost
> five years. We went through the typical process of evaluating the different
> alternatives that we had, and we thought that selling the company was the best
> alternative for us. So in exploring that possibility, we looked at different players, both
> inside the country and outside the country, as possible buyers. We identified Total
> as an important one with whom we started negotiating towards the middle of 2007,
> and then also looked at other candidates. But, after a total analysis, we decided on
> March 7, 2008, via a resolution from the Board of Directors of the corporation that
> allowed me or authorized me to sell the company to -- basically, you know, sell to
> Total.

(Docket No. 162, p. 23–24).

Good faith in a market withdrawal turns on the subjective intent of the franchisor; the PMPA

requires that the franchisor's decision lack a discriminatory motive and not be a sham for terminating

particular franchises. See Massey v. Exxon Corp., 942 F.2d 340, 345 (6th Cir. 1991) (citing S. Rep.

No. 95-731, *reprinted in* 1978 U.S.C.C.A.N. 873, 896). Here, the plaintiffs do not point out any

evidence contradicting Trujillo's testimony or otherwise establishing an improper motive; rather,

they merely conclude that "a very reasonable inference must be afforded to the Plaintiffs that instead

of tempering its profits over time, Esso took their money and ran." (Docket No. 319, p. 14–15).

At the outset, it is not at all clear that the PMPA implicates a franchisor's decision to leave

a market on profit grounds. See also S. Rep. No. 95-731, 1978 U.S.C.C.A.N. at 896 (good faith and

normal course of business requirements "provide adequate protection of franchisees from arbitrary

or discriminatory non-renewal, yet avoid judicial scrutiny of the business judgment itself."). But

even assuming such a motive would defeat the defense, plaintiffs' desired inference does not follow from the predicate facts. Notwithstanding the rhetoric of "Esso's failure to protect previous Esso dealers," plaintiffs' reasoning reduces to this: because (1) Esso's notice letters did not detail its rationale for withdrawing from Puerto Rico, and (2) Total's franchise offer is not acceptable to plaintiffs, the court should infer that (3) "Esso sold out the dealers in exchange for a higher profit," in bad faith. (See Docket No. 319, p. 14–15). But neither predicate fact lends rational support to the conclusion. Esso was not obligated to provide any greater level of detail than it did, so its choice not to volunteer more information in a statutory notice letter is not probative of either pretext or bad faith. Moreover, the palatability of *Total's* new offer bears no logical connection to what *Esso's* corporate intent was. Notwithstanding plaintiffs' arguments about caution in resolving subjective intent at summary judgment, Esso offers uncontroverted evidence showing its determination was made in good faith, and plaintiffs offer only conclusory allegations suggesting otherwise.

### B.    Determination Made After Signing or Renewal

To establish a market withdrawal defense, Esso must also be able to show it did not renew plaintiffs' franchises after it made the determination to leave Puerto Rico. "Generally, the approval of the franchisor's Board of Directors constitutes the legally effective date of a decision" under the PMPA. Unocal Corp. v. Kaabipour, 177 F.3d 755, 765 (9th Cir.), *cert. denied*, 528 U.S. 1061 (1999). This rule of thumb reflects a common pattern in market withdrawal cases, where the franchisor shows that it had weighed competing options, solicited offers, and tentatively negotiated over a span of time before accepting an offer; the "determination" only occurred when a final decision was reached by the board of directors. See, e.g., May-Som Gulf, Inc. v. Chevron, U.S.A., Inc., 869 F.2d 917, 926–27 (6th Cir. 1989); Anderson v. Chevron Corp., 933 F.Supp. 52, 59 (D.D.C. 1996); Florham Park Chevron, Inc. v. Chevron, U.S.A., Inc., No. 86-4748, 1987 WL 19492, at *3 (D.N.J. Nov. 4, 1987). No hard-and-fast rule necessarily controls all cases, however; as one court cogently summarized:

> [T]he statutory language "decision to withdraw" cannot be understood as having a plain or fixed meaning. The reality of corporate decisionmaking is that there is no single, universal and steadfast method by which corporations make their decisions.

> Thus, a court's determination as to the moment at which a withdrawal decision occurred necessarily entails a case-by-case analysis conducted in accordance with the realities of corporate decisionmaking.
>
> Pinpointing the withdrawal decision is further complicated by competing policy considerations embodied in the PMPA itself. The PMPA attempts to reconcile two conflicting aims—(1) to protect franchisees' reasonable expectations and (2) to insure that distributors retain adequate flexibility to respond to changing market conditions and consumer preferences. The court's interpretation of the market withdrawal provision must reflect the balancing of these competing interests.

Anderson, 933 F.Supp. at 58. Florham Park provides a typical example. There, Chevron began studying ways of reducing its debt in April 1984, including the sale of assets it had recently acquired. Florham Park, 1987 WL 19492, at *3. A "study team" at Chevron contacted various potential buyers in early 1984; by September 1985, Chevron sent them bidding instructions and a draft sale agreement, which contained a disclaimer that Chevron had not decided to sell any assets and conditioned acceptance on board approval and execution of a sale agreement. Id. The board tentatively accepted a bid on November 7, 1985, and executed a binding agreement on December 19, 1985. Id. The court found that, as a matter of law, Chevron determined to withdraw on November 7, 1985; the earlier overtures were not binding on the corporation, and thus did not constitute a determination. Id.

Here, the various plaintiffs' franchises with Esso were last renewed between August 31, 2007 and January 1, 2008. Therefore, Esso must point to evidence dating its determination after January 1, 2008. It is uncontested that Esso's board did not resolve to sell Esso's assets until March 7, 2008. Trujillo further testified that prior to March 2008, Esso was studying alternatives and negotiating with different buyers, but it had not committed to Total until March. (Docket No. 162, p. 23–24). Plaintiffs counter that Esso "announced publicly that it had decided to withdraw from the marketing of motor fuels in Puerto Rico" at some point in 2007, and that it had reportedly sold off some of its franchises. (Muñoz St., ¶ 5). But even taken as true, this statement does not raise a genuine question about the timing of Esso's determination. While a jury could infer that Esso was seeking buyers, even publicly, there is nothing to support an inference that the corporation's decision-making process had crystallized before negotiations with Total concluded. Because plaintiffs' proffer is not

probative of when a corporate decision was made, while Esso has offered uncontradicted evidence that the board resolved to sell its assets in March 2008, there is no issue of material fact on this element.

### C.      Changes in Relevant Facts and Circumstances

Esso must also show that its decision was based on changes in "relevant facts and circumstances" occurring after January 1, 2008.  See 15 U.S.C. § 2802(b)(2)(E)(i)(II).  The conclusion of negotiations with a buyer constitute such a change, since "the presence of a willing *and acceptable* buyer is a fundamental change in market conditions . . . ." May-Som Gulf, 869 F.2d at 926 (emphasis added); accord Kaabipour, 177 F.3d at 764 ("By the same token, the relevant facts and circumstances clearly changed after October 1, 1996, because only after that was a sale to Tosco negotiated and an even semisolid decision to withdraw reached.").

Here, Esso points to Trujillo's testimony that it negotiated with other buyers in addition to Total, going "back and forth up to . . . March 7, 2008," when the decision to make a deal with Total was fixed by board resolution.  (Docket No. 299-2, p. 7; Esso St., ¶¶ 2–3).  Plaintiffs do not challenge this element of the defense; thus, I conclude that Esso has provided enough evidence of changed circumstances to satisfy this element of the defense.

### D.      Offers from New Franchisor

Next, plaintiffs argue that Esso cannot show Total offered them non-discriminatory franchise contracts in good faith.  Total responds that it offered Esso franchisees the same contract as all other potential and renewal franchisees.  For clarity, I first consider whether the defendants can show Total acted in good faith, and second, whether they can show Total's offers were non-discriminatory.

#### 1.      Good Faith

While the PMPA does not define "just *what* must be done in good faith by the new franchisor," the legislative history supports at least one of two interpretations, and possibly both: first, that the new franchisor have a subjectively legitimate intent in making its offers, and second that the offer not be "structured to be unacceptable and intended to provoke refusal." *Santiago Appeal*, 643 F.3d at 6.  Though the inclusion of unlawful terms that are "so harmful to the core

franchise bargain as to invite rejection" could evince bad faith, there is no *per se* rule for scattered

unlawful provisions. Id. at 7–8.

Here, Total argues that it acted in good faith and intended its offers to be accepted because

its contract provisions were based on its subjective business judgment and experience. (Docket No.

358, p. 33–37). Plaintiffs complain that (1) Total used a "take it or leave it" approach to negotiating

core franchise terms, and (2) various terms of the contracts are allegedly illegal under the PMPA,

Puerto Rico law, and other regulations. (Docket No. 319, p. 7–8; Muñoz St., ¶ 11; Docket No. 347,

p. 7; Docket No. 401, p. 14–15). Neither ground, however, permits an inference of bad faith.

First, Total's admitted refusal to negotiate certain franchise terms cannot, without more, form

the basis of an inference of bad faith. Magistrate Judge Arenas canvassed the relevant jurisprudence

on this argument in the Santiago cases:

> Plaintiffs argue that Total lacked good faith because it presented its franchise offer
> to plaintiffs on a "take-it-or-leave-it" basis. I have already held, however, that the
> fact "[t]hat Total offers the franchisees the franchise agreements on a
> 'take-it-or-leave-it' basis is a business decision, good or bad, right or wrong, which
> the court cannot supervise, alter or question, as long as such a decision is devoid of
> bad faith." Santiago-Sepúlveda v. Esso Standard Oil Co. (P.R.), 582 F.Supp.2d at
> 181 (citing Massey v. Exxon Corp., 942 F.2d 340, 344-45 (6th Cir.1991); Coast Vill.,
> Inc. v. Equilon Enters., LLC, 163 F.Supp.2d at 1148; S. Nev. Shell Dealers Ass'n v.
> Shell Oil Co., 725 F.Supp. 1104, 1109 (D.Nev.1989); Jet, Inc. v. Shell Oil Co., 381
> F.3d 627, 630 (7th Cir.2004)). Indeed, "'take it or leave it' notices such as the one
> here comply with the PMPA when the franchisor's decision rests on economic
> grounds." Svela v. Union Oil Co. of Cal., 807 F.2d 1494, 1499, 1501 (9th Cir. 1987)
> (quoting Baldauf v. Amoco Oil Co., 553 F.Supp. 408, 412, 416-17 (W.D.
> Mich.1981) ("So long as the franchisor does not have a discriminatory motive or use
> the altered terms as a pretext to avoid renewal, the franchisor has met the burden
> required by the PMPA for determining good faith."); Meyer v. Amerada Hess Corp.,
> 541 F.Supp. 321, 330 (D.N.J. 1982) ("The fact that new terms are presented on a take
> it or leave it basis does not constitute a lack of good faith."))

Santiago-Sepúlveda v. Esso Std. Oil Co. (P.R.) (*Santiago Postjudgment Order*), 638 F.Supp.2d 193,

199 (D.P.R. 2009). Total's marketing director testified that Total standardized its contracts with all

new and renewal franchisees, and that revisions to standard terms were based on Total's experience

in Puerto Rico and the market conditions. (Docket No. 162, p. 109–113). Because plaintiffs do not

point to any evidence showing that this explanation is illegitimate or a pretext for forcing

terminations, the "take it or leave it" strategy alone does not preclude a finding of good faith on

Total's part.

Plaintiffs' illegality arguments are equally unconvincing.  First, the plaintiffs' motions and filings, at their best, merely *conclude* that certain parts of Total's offered contracts are unlawful, providing "neither the necessary caselaw nor reasoned analysis to show that [they are] right about any of this."  <u>Velásquez Rodríguez v. Mun'y of San Juan</u>, 659 F.3d 168, 176 (1st Cir. 2011); (<u>see, e.g.</u>, Docket No. 321, ¶ 11(a)).  And at their worst, plaintiffs do little more than mention which provisions they find objectionable, without further explanation.  (<u>See, e.g.</u>, Docket No. 321, ¶ 11(b)).  Since a court need not flesh out arguments mentioned "in the most skeletal way," plaintiffs are entitled to no further consideration of these points.  <u>Zannino</u>, 895 F.2d at 17.

Yet even granting the premise that at least some of Total's offered provisions are unlawful, "the 'good faith' test is not failed merely because a couple of terms in a complex contract are at odds with state contract or franchise law, itself often no model of clarity."  <u>See</u> *Santiago Appeal*, 643 F.3d at 7–8 (citing <u>Mac's Shell Serv., Inc. v. Shell Oil Prods. Co.</u>, 130 S.Ct. 1251, 1260 n. 7 (2010)).  Plaintiffs assert that the offers "do not allow previous Esso dealers . . . to maintain a viable operation under these terms" because they are "illegal, unfair and/or so burdensome that they become impossible to comply with." (Docket No. 319, p. 8).  Their statement of facts highlights 13 terms as objectionable,[8] but their briefing never articulates why any of them, individually or together, are "so harmful *to the core franchise bargain* as to invite rejection."  <u>See</u> *Santiago Appeal*, 643 F.3d at 8 (emphasis added).  As Magistrate Judge Arenas observed, "[t]he essence of the agreement was an accord by which plaintiffs would pay Total for the right to sell gasoline under the Total trademark."

---

[8] The plaintiffs complain of (1) integration of the convenience store and motor fuel agreements such that a breach of one is treated as a breach of both; (2) Total's right to vary prices, methods, and other aspects of the goods to be supplied; (3) unspecified "financial requirements and terms of credit;" (4) Total's treatment of unspecified "maintenance and operational requirements" as material to the overall franchise for the purpose of finding a breach; (5) Total's right to sublet the premises without a rent offset; (6) Total's right to sublet without negotiation; (7) Total's right to veto assignments of the franchise; (8) Total's right to a share of any profits from a sale of the franchise; (9) unspecified "increased maintenance obligations"; (10) the imposition of unspecified service fees; (11) the contract's treatment of dealer-made improvements to the premises; (12) the allocation of tax and other unspecified duties to the dealer, and (13) the treatment of "hereditary rights established by the Puerto Rico Civil Code." (Docket No. 321, ¶ 11).  Unhelpfully, plaintiffs never pinpoint where any of these terms appear in the Total agreements.  <u>See</u> Local Rule 56(e).

*Santiago Postjudgment Order*, 638 F.Supp.2d at 199; see also 15 U.S.C. § 2801(1) (franchise defined as "any contract . . . under which a refiner or distributor . . . authorizes or permits a retailer or distributor to use, in connection with the sale, consignment or distribution of motor fuel, a trademark which is owned or controlled by such refiner . . . ."). Moreover, it is uncontested that Total's franchise contract contains a severability provision, saving the overall agreement even where particular provisions are unenforceable. (Total St., ¶ 25). Thus, I am persuaded by the Court of Appeals's reasoning that Total's inclusion of the invalidated terms[9] could not, without more, indicate an intent that franchisees reject the contract. See *Santiago Appeal*, 643 F.3d at 6 ("So we see no basis for suggesting that Total *intended* that its offer be rejected, and plaintiffs point to nothing that would support such an inference.") (emphasis in original). In short, plaintiffs offer no analysis of what impact these provisions have on the core franchise bargain, and why they evince Total's bad faith. They have therefore failed to demonstrate a triable issue of fact regarding the good faith of Total in offering these terms.

Plaintiffs conclude that "a reasonable inference exists that Total's offers were not made in good faith, and that Total's real intent was to compel franchisees to abandon the premises . . . ." (Docket No. 319, p. 17). But there is simply no evidence, direct or circumstantial, permitting any such inference about Total's subjective intent. Without such evidence, Total's unchallenged testimony asserting good faith reasons for its decisions is conclusive enough to allow summary judgment.

---

[9] The court specifically invalidated Article 4.1 of the Lease Contract (permitting subleases without any right to rent discounts or credits), Article 4.4 of the Lease Contract (giving Total sole and absolute discretion to make additional investments in premises and increase the minimum rent), and Article 11.2 of the Franchise Contract (requiring retailers to exclusively purchase Total-endorsed products). Santiago-Sepúlveda v. Esso Std. Oil Co. (P.R.) (*Santiago Partial Judgment*), 634 F.Supp.2d 201, 211–12 (D.P.R. 2009). The court further clarified that Article 5.2 of the Sublease Agreement and Article 4.2 of the Lease Contract were unenforceable because they also permitted unilateral increases in minimum rent. *Santiago Postjudgment Order*, 638 F.Supp.2d at 204–05. Though the Santiago findings are not binding here, I further observe that the court considered and rejected challenges to the legality of Total integrating the convenience store and fuel contracts, keeping a share of profits from sale of the franchise, and reserving a right to supply non-branded gasoline. See *Santiago Partial Judgment*, 634 F.Supp.2d at 208–11; *Santiago Postjudgment Order*, 638 F.Supp.2d at 200–04.

### 2.    *Non-Discriminatory Terms*

In pertinent part, the PMPA required that Total's offer be made "on terms and conditions which [were] not discriminatory to the franchisee as compared to franchises *then currently being offered* by such other person *or* franchises then in effect . . . ." See 15 U.S.C. § 2802(b)(2)(E)(iii)(II) (emphasis added).  Variations among offers based on differences among the conditions at particular franchise sites are not discriminatory so long as similarly-situated franchisees receive similar offers. See *Santiago Appeal*, 643 F.3d at 5 (dicta).  Total's marketing director testified that Esso retailers were offered "standard franchise contracts," which were the same as those offered to all new potential Total dealers.  (Esso St., ¶ 15).  Total also submitted examples of standard contracts. (Docket No. 359-14, p. 33-63; Docket No. 359-15, p. 30–56; Docket No. 359-16, p. 32–65).

Plaintiffs counter that this testimony is not conclusive enough to grant summary judgment, as it lacks "details of the previous and new Total franchisors [sic] and the conditions of their franchise relationships as opposed as [sic] to what the Plaintiffs were offered."  (Docket No. 401, p. 15).  But once a moving party identifies evidence showing the absence of a genuine dispute, the opponent "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586.  Here, contracts with past franchisees are irrelevant, since Total only argues that its offers were non-discriminatory compared to those it was offering other dealers at the time.  And in light of the uncontroverted testimony regarding Total's practices in making new franchise offers, there is no additional probative value in examining the offers made to plaintiffs and particular other franchisees.  Plaintiffs have not shown a trialworthy question of whether Total's offers were made on non-discriminatory terms, and Total's evidence meets its burden.

Because Esso and Total have together offered evidence conclusively showing each element of the compliance defense, and plaintiffs have not raised material issues of fact as to any of them, the defendants are entitled to summary judgment on plaintiffs' PMPA claims.

## THE GONZÁLEZ PLAINTIFFS' PRIVATE AGREEMENT

Independently of their PMPA claims, the González plaintiffs argue that Esso must return a $250,000 initial payment made under a "private agreement" executed in 1990.  Esso and the

González plaintiffs have made cross motions for summary judgment on this claim.  Of course, a court "must view each motion separately, perusing the record through the standard summary judgment prism."  Gonzalez-Droz v. Gonzalez-Colón, 660 F.3d 1, 8 (1st Cir. 2011).   With that in mind, I consider plaintiffs' motion first, followed by Esso's motion.

### *Plaintiffs' Motion for Summary Judgment*

The González plaintiffs argue that the 1990 private agreement requires Esso to return $250,000 when the franchise is terminated.  Under the Puerto Rico Civil Code, a contract must be interpreted literally when its terms are clear and leave no room for doubt or difference in interpretation.  Home Ins. Co. v. Pan Am. Grain Mfg. Co., 397 F.3d 12, 16 (1st Cir. 2005) (citing Heirs of Ramírez v. Superior Ct., 81 P.R.R. 347, 351 (1959)); 31 L.P.R.A. § 3471.  If there is no ambiguity in the contract, which is a legal determination, then a court may interpret the contract at summary judgment.  Torres Vargas, 149 F.3d at 33.  But where there is ambiguity, summary judgment is inappropriate unless undisputed evidence "supports only one of the conflicting interpretations."  Adria Int'l Group, Inc. v. Ferré Devel., Inc., 241 F.3d 103, 111 (1st Cir. 2001).

Here, the private agreement discusses a $250,000 payment in two sections.  First:

1.   Esso will deliver the gas service station and Esso Shop located on State Road No. 3 in Luquillo to the retailer after [receiving from the retailer] a payment of US$250,000 (TWO HUNDRED AND FIFTY THOUSAND DOLLARS) in legal currency, which payment shall be made as follows:

   a.   One payment of US$50,000.00 (FIFTY THOUSAND DOLLARS) at the time of signing this agreement.

   b.   One payment of US$200,000 (TWO HUNDRED THOUSAND DOLLARS) no more than thirty (30) days from the date of this agreement.

(Docket No. 299-7, p. 2–3) (brackets in original).  Second, it states:

11.   The parties hereby agree that if Mr. CARLOS MANUEL GONZALEZ RAHOLA, for causes related to his will, fails to comply with any or all of the provisions of this private agreement and/or of the lease agreement, Esso shall be authorized to withhold as a liquid penalty fifty percent (50%) of the first payment for the acquisition of the right to operate the gas service station and convenience store, and to terminate any agreements that are in effect pursuant to the applicable laws.

   In such case, the retailer shall vacate the leased premises and facilities and

> place them at Esso's disposal without delay and without raising any claims
> or defenses.

(Docket No. 299-7, p. 6). The González plaintiffs essentially argue that paragraph 11 is surplusage unless it is read for the negative implication that *unless* González Rahola willfully breaches the contract, Esso cannot keep *any* of the $250,000. (Docket No. 331, ¶¶ 10–11). However, a literal reading of the contract shows that plaintiffs' analysis overstates the reach of paragraph 11.

It is uncontested that González Rahola did not willfully breach his agreements with Esso. But in a counterfactual scenario where he had done so, paragraph 11 would trigger two consequences. First, Esso would become authorized to both terminate any agreements with the retailer and withhold half of "the first payment for the acquisition of the right to operate the gas service station and convenience store." As González Rahola correctly observes, the implication of withholding a portion of the payment is that the remainder is *not* withheld, but rather, returned. But importantly, the second consequence is that plaintiffs would be required to vacate and turn over the premises, "without delay and without raising any claims or defenses."

In a situation where González Rahola does not willfully breach his agreements, however, the predicate condition for paragraph 11 is not satisfied. As a result, none of the obligations triggered by that condition have effect. This is a two-way street: Esso lacks the option to either terminate the agreement or withhold half of the payment; since no portion of the payment is "withheld," the silent implication that the remainder not be withheld is not triggered. But González Rahola is likewise not required to give up the premises to Esso "without delay and without raising any claims or defenses." As Esso correctly observes, no other part of the private agreement states an obligation to return any part of the first payment. (See Docket No. 334, p. 8). Moreover, there is no other language, such as the term "deposit," implying that the payment would be refunded at the end of the franchise.

Neither party argues that the disputed terms are ambiguous, nor do I discern any terms or clauses that provide alternative or inconsistent meanings; thus, I find that the contract is unambiguous, and that interpreting it at summary judgment is proper. See Torres Vargas, 149 F.3d at 33; cf. Wells Real Estate Inv. Trust II, Inc. v. Chardon/Hato Rey P'ship, S.E., 615 F.3d 45, 47–48,

54–55 (1st Cir. 2010) (holding contract ambiguous where parties' definition of "Material Damage" was inconsistent with parties' special definition of "Property" outside its ordinary meaning).

The González plaintiffs cannot show that the contract can be interpreted to require a refund outside of the circumstances anticipated in paragraph 11, in which case they are also forced to surrender the premises. Because no ambiguity is evident, and because the plain construction of the contract does not support plaintiffs' claim, they are not entitled to summary judgment.

### Esso's Motion for Summary Judgment

Esso has shown that it is entitled to summary judgment. There are no disputed facts that are material to this claim, and the finding that the contract is unambiguous is a legal conclusion. See Torres Vargas, 149 F.3d at 33. Thus, I apply the same construction of the contract explained above: because paragraph 11 is not operative unless González Rahola willfully violated the agreements, and because it is undisputed that he did not do so, its provisions do not apply here. Therefore, Esso is under no obligation to return any part of the $250,000 fee, and it is entitled to dismissal of the González plaintiffs' claim as a matter of law.

## CONCLUSION

For the foregoing reasons, Esso and Total's motions for summary judgment are **GRANTED.** The plaintiffs' claims against Esso and Total under the PMPA and the González plaintiffs' claim against Esso for $250,000 are **DISMISSED WITH PREJUDICE**. The González plaintiffs' motion for summary judgment is **DENIED**. The "Verified Amended Complaint" at Docket No. 246 is **LEFT WITHOUT EFFECT** for failure to obtain leave of court.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 19th day of March, 2012.

*S/Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge
